UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                                      Plaintiff,

v.

MCLANE/EASTERN, INC., *doing business as* McLane
Northeast,

                                      Defendant.

5:20-cv-1628 (BKS/ML)

_____

**Appearances:**

*For Plaintiff:*
James E.B. Bobseine
Trial Attorney
Equal Employment Opportunity Commission
300 Pearl Street, Suite 450
Buffalo, NY 14202

*For Defendant:*
Christopher J. Harrigan
Arianna E. Kwiatkowski
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

     Plaintiff, the United States Equal Employment Opportunity Commission ("EEOC"), brought this action against Defendant McLane/Eastern, Inc., doing business as McLane Northeast ("McLane"), asserting a claim for disability discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 (the "ADA"), as amended. (Dkt. No. 1). Plaintiff

alleges that Defendant violated the ADA by failing to interview and hire Shelley Valentino, a woman who is deaf, because of her disability. (*See generally id.*). Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 45). The parties have filed responsive briefing. (Dkt. Nos. 46, 47). For the following reasons, the Court denies Defendant's motion for summary judgment.

## II.     FACTS[1]

Defendant is a supply chain services company which operates a distribution center and warehouse facility in Baldwinsville, New York. (Dkt. No. 45-2, ¶¶ 3–4; Dkt. No. 46-1, ¶¶ 3–4). The Baldwinsville facility employs approximately 650 people and distributes products to retail businesses throughout the Northeast. (Dkt. No. 45-2, ¶ 4; Dkt. No. 46-1, ¶ 4). The company's Warehouse Selector II position "is responsible for selecting designated open-case product and placing it securely in a tote or box to fulfill customer orders" and is important "to customers receiving the correct product on time and in saleable condition." (Dkt. No. 45-5, at 39–40 (job description)). The Warehouse Selector II job description indicates that the position's minimum qualifications are that the employee have a high school diploma or GED; be 18 years or older; be able to speak, read, and understand the English language; and be able to successfully pass a physical capabilities test, drug screen, and criminal background check. (*Id.* at 39).[2] The Warehouse Selector IV position, which has the same minimum qualifications as the Warehouse Selector II position, "is responsible for selecting designated product, securely loading it into a cart or onto a pallet and using power equipment to transport it to the designated dock area to

---

[1] The facts are drawn from Defendant's Statement of Undisputed Material Facts and Plaintiff's Response to Defendant's Statement of Material Facts, (Dkt. Nos. 45-2, 46-1), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[2] The parties do not dispute that Valentino met these minimum qualifications.

2

fulfill customer orders." (*Id.* at 42–43 (job description)). Both the Warehouse Selector II and Warehouse Selector IV positions are entry-level jobs. (Dkt. No. 14-16, at 13).

Defendant's Human Resources Manager, Anne Orr, was responsible for reviewing job applications. (*Id.* at 12). In reviewing applications for the Warehouse Selector II and IV positions, Orr looked for "preferred qualifications," which she described as "warehouse experience," "fast-paced environment type of experience," and "steady employment history." (*Id.* at 19–22; *see also* Dkt. No. 45-5, at 4 (Defendant's position statement in response to charge of discrimination stating that Orr reviewed applications for "preferred qualifications such as recent warehouse, labor-intensive or fa[st]-paced (such as fast-food, retail or production/factory) experience")). These preferred qualifications are not listed in either job description or otherwise in writing. (Dkt. No. 45-16, at 20–21). Orr often reached out to job applicants by phone to gather more information and schedule an in-person interview for viable candidates. (*Id.* at 34).[3] Department supervisors made the ultimate decision about whether to hire a particular applicant. (*Id.* at 26–27).

A.   **Valentino's Applications**

On March 12, 2018, Shelley Valentino applied online for two open positions with Defendant: Warehouse Selector II and Warehouse Selector IV. (Dkt. No. 45-2, ¶¶ 5–6; Dkt. No. 46-1, ¶¶ 5–6; Dkt. No. 45-5, at 31–37 (Valentino application for Warehouse Selector II)). Valentino's application indicated two prior work experiences: working as a hostess and busser at Plainville Restaurant between August 2007 and July 2008, and as a filing and data entry clerk

---

[3] Orr testified at her deposition that she generally broke applicants into three "tiers." (Dkt. No. 45-16, at 12–13). She called Tier I candidates to conduct a phone screen and, if that went well, schedule them for an on-site interview. (*Id.*). If Orr needed more applicants, she would begin calling Tier II candidates, who "may not have preferred qualifications," to see if a candidate was interested in the position and able to provide more information about work history or any gaps in employment. (*Id.*). Tier III applicants were "not viable" and "dispositioned out." (*Id.* at 12).

3

between January and October 2003. (Dkt. No. 45-5, at 32, 36). Her resume indicated that she received her GED in 2005, a certification in medical billing and coding in 2011, and an associate degree in health information technology in 2016. (*Id.* at 36). Valentino's application nowhere indicates that she has any disability or requires any accommodation. (Dkt. No. 45-2, ¶ 11; Dkt. No. 46-1, ¶ 11).

Orr reviewed Valentino's applications the same day they were submitted. (Dkt. No. 45-2, ¶ 7; Dkt. No. 46-1, ¶ 7). Although she does not independently remember reviewing Valentino's applications in March 2018, (Dkt. No. 45-16, at 59), Orr has stated that the applications did not reflect "preferred qualifications for either position," as Valentino did not have "recent prior warehouse, labor-intensive, or fast-paced . . . work experience," (Dkt. No. 45-5, at 47; Dkt. No. 45-16, at 59–60 (same)). Valentino's application indicated that she had less than two years' work experience total and that her most recent work experience was almost ten years prior to her applications. (*See* Dkt. No. 45-5, at 47). It is undisputed that Orr called Valentino on March 12, 2018 at approximately 12:20 p.m. and left a voicemail. (Dkt. No. 45-5, at 47; Dkt. No. 45-13, at 81 (applicant tracking system note indicating that Orr left message on machine asking for a return call to discuss application)).[4] Orr states that she called Valentino to obtain more information, as "applicants sometimes inadvertently omit recent relevant work experience." (Dkt. No. 45-5, at 47). Plaintiff argues that this was not the true reason for Orr's call, because Orr testified at her deposition that job applicants omitted work experience only 1–2% of the time, (Dkt. No. 45-16, at 33), and Orr called applicants for a number of reasons. (Dkt. No. 46-1, ¶ 12).

---

[4] Orr testified at her deposition that whenever she called an applicant and left a message asking for a return call, she would leave her direct phone number. (Dkt. No. 45-16, at 37). If an applicant called Orr's direct number, the applicant would reach either Orr or her voicemail. (*Id.*).

4

1.      **TRS Call**

Valentino attempted to return Orr's call on the afternoon of March 12 using a telecommunications relay service ("TRS"). (Dkt. No. 45-2, ¶ 14; Dkt. No. 46-1, ¶ 14). During a TRS call, which are commonly used by individuals who are deaf, are hard of hearing, or have a speech impediment, an individual places a call through an operator, who interfaces with the person on the receiving line. (*See* Dkt. No. 45-15, at 14). The recipient of the phone call speaks to the operator, who types the message to the individual who placed the call, who in turn responds by typing a message. (*Id.*). The phrase "go ahead" or "GA" is used to indicate the end of a message. (*Id.*). While Valentino generally understands that the operator "explains that [a call] is a relay service" to the recipient, she does not know what exactly the operator says to do so. (*Id.* at 14–15).

Valentino placed her relay call through Sprint Corporation who, in response to a subpoena, indicated that TRS operators "are trained to announce a call with a scripted explanation of service before the call begins." (Dkt. No. 46-2, at 109).[5] Operators are afforded flexibility in explaining the service but are required to state that "[e]verything that is heard will be typed to" the person who placed the call. (*Id.*). Sprint further produced a "guided training response" for its operators, consisting of two announcement options and two explanation options. (*Id.*). One option expressly indicates that the person who placed the call "is deaf or hard of hearing," while the other does not. (*Id.*). For example, one explanation option includes the statement "The person on the line is using a free internet service to communicate with you," while the other option states: "The person who has called you is deaf or hard of hearing." (*Id.*).

---

[5] The operator of the TRS call in question has not been identified or deposed.

Valentino's TRS call dialed Defendant's main number, and an individual who identified herself as "Sara with claims customer service" answered. (Dkt. No. 46-2, at 134 (call transcript); Dkt. No. 45-15, at 29–30 (Valentino explaining at her deposition that she had the transcript emailed to herself through the TRS chat room at the end of the call)). After Valentino stated that she was returning a call from McLane about her application, Sara said "it sounds like she may need the human resources department" and that she would "put [her] through." (Dkt. No. 46-2, at 134). Another McLane employee then answered and asked how the employee can help but did not identify his or her department. (*Id.*).[6] The transcript next indicates "(explaining relay)," without providing any further detail about what the operator said. (*Id.*). When Valentino stated she "received a call from McLane" regarding an application, the employee asked: "if Ann[e] calls her back does she call her . . . phone number or how does that work[?]" (*Id.*). Valentino asked: "can she email me instead?" (*Id.*). The employee said yes, confirmed Valentino's email address, and stated: "I will have Ann[e] call or email[.] Right now she has a couple team[m]ates with her. I will have Ann[e] . . . email Shelley." (*Id.*). The call was disconnected at 2:13 p.m. (*Id.*). It is undisputed that Valentino did not identify herself as a deaf person during the call. (Dkt. No. 45-2, ¶ 15; Dkt. No. 46-1, ¶ 15). Valentino testified at her deposition that she believed the employee with whom she spoke was "uncomfortable." (Dkt. No. 45-15, at 32).

### 2. Testimony of Human Resource Employees

In March 2018, there were four employees in Defendant's Human Resources Department, Orr and three HR Clerks: Sherri DeWitt, Kathleen Weymouth, and Tracey Gridley. (Dkt. No. 45-16, at 54). All four individuals were deposed and testified that they did not participate in the March 12, 2018 TRS call. Orr testified that she never became aware in March

---

[6] The identity of this employee has not been determined.

2018 of an individual at the office who received a TRS call, never received a message from an employee that a TRS call had been received, and never received any message indicating that Valentino had returned her call and left a message. (*Id.* at 58; *see also id.* at 57 (testifying that the HR clerks were "very, very good at making sure I got my messages")). Orr testified that she first became aware that Valentino has a disability when Defendant received the charge of discrimination. (*Id.* at 60).

HR Clerk Sherri DeWitt testified that she has never received a call from someone using a TRS, including on March 12, 2018. (Dkt. No. 45-13, at 36). She does not recall ever receiving a message that Valentino called regarding her applications. (*Id.* at 38). Kathleen Weymouth similarly testified that she does not recall receiving a TRS call at work or any other employee in the HR Department receiving one. (Dkt. No. 45-14, at 47). Finally, Tracey Gridley, who worked part-time, also testified that she has never "communicated over the phone with an individual using a telecommunications relay service." (Dkt. No. 45-17, at 44). However, Gridley also testified that she and Orr had a conversation about TRS calls at some point, although she could not remember when this conversation took place or details about what was discussed. (*Id.* at 41–42; *id.* at 42 (stating that it was "possible" the conversation occurred in March 2018); *id.* at 51–52 (testifying that the conversation took place before the charge of discrimination)). She testified that the conversation did not relate to any particular job applicant or to any call that had been received in the HR Department. (*Id.* at 42–43). Gridley did not recall anyone at McLane ever discussing a job applicant who had called in using TRS. (*Id.* at 47).

### 3.     Disposition of Valentino's Applications & McLane's Hiring Decisions

On March 13, 2018 at 10:11 a.m., Orr rejected Valentino's applications for the Warehouse Selector II and IV positions. (Dkt. No. 45-5, at 29).[7] The reason given in the applicant tracking system was that Valentino did not meet the company's preferred qualifications. (*Id.*).

Defendant received a total of 208 applications for the Warehouse Selector II position and hired 15 individuals. (Dkt. No. 45-2, ¶ 21; Dkt. No. 46-1, ¶ 21). Similarly, Defendant received 209 applications for the Warehouse Selector IV position and hired eight individuals. (Dkt. No. 45-2, ¶ 23; Dkt. No. 46-1, ¶ 23). Defendant asserts that the 23 individuals who were hired for these positions "all met McLane's preferred qualifications." (Dkt. No. 45-2, ¶¶ 22, 24; Dkt. No. 45-16, at 31).

### 4.     Further Applications

On March 22, 2018, Valentino reapplied for the Warehouse Selector II and IV positions. (Dkt. No. 45-5, at 29). Orr reviewed these applications that same day and rejected them, indicating again that Valentino did not meet the preferred qualifications. (*Id.*). Valentino again applied for the Warehouse Selector IV position on April 14, 2018, and her application was rejected on April 18, 2018. (*Id.*).

### B.     Charge of Discrimination and Procedural History

Valentino filed a charge of discrimination against McLane with the EEOC on August 23, 2018. (Dkt. No. 45-4, at 4–5). She stated that her use of a TRS call "would have put the company on notice that [she is] an individual with a disability and would have signaled to the company the

---

[7] Orr testified at her deposition that she gave applicants "[a]pproximately 24 to 36 hours" to return a call before "mov[ing] on." (Dkt. No. 45-16, at 36). She explained that "[i]t wasn't a rule" in terms of being a "fixed time" but that if she had not "heard back from [an] applicant, [and] it's been a day or two," she would need "to move on," and the applicant would be "dispositioned out." (*Id.*). She "did not call twice." (*Id.*).

8

specific nature of [her] disability," and that she "believe[s] that [she] was denied employment because of [her] disability." (*Id.*). After conciliation efforts between the EEOC and Defendant were unsuccessful, the EEOC commenced this action "to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Shelley Valentino." (Dkt. No. 1, at 1; *see* Dkt. No. 45-8, at 16–25, 28–30); *see* 42 U.S.C. §§ 12117(a), 2000e-5(f)(1), (3).

### III. STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*,

477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.   DISCUSSION

Defendant moves for summary judgment dismissing Plaintiff's complaint, arguing that (1) Plaintiff cannot establish a prima facie case of disability discrimination because Defendant had no knowledge of Valentino's disability, and (2) Defendant has articulated legitimate, non-discriminatory reasons for not interviewing or hiring Valentino. (*See generally* Dkt. No. 45-1).

The ADA prohibits covered entities from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims of disability discrimination brought pursuant to the ADA are subject to the burden-shifting standard set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009). Under this framework, a plaintiff must first establish a prima

facie disability discrimination claim, which requires showing that: (1) the employer is subject to the ADA, (2) the individual allegedly discriminated against "is disabled within the meaning of the ADA or perceived to be so by her employer," (3) the individual "was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation," (4) the individual suffered an adverse employment action, and (5) the adverse action was imposed "because of her disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)); *see also Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019) (holding that an ADA plaintiff must prove that "the discrimination was the but-for cause of any adverse employment action.").

If a plaintiff establishes a prima facie case of disability discrimination by "produc[ing] minimal evidentiary support for the claim of discriminatory motivation," the "burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse employment action." *Davis*, 804 F.3d at 235. If the employer does so, the plaintiff "must 'demonstrate that the proffered reason was not the true reason for the employment decision." *Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 54 (E.D.N.Y. 2021) (citation omitted); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (noting that if a defendant employer proffers "a legitimate non-discriminatory reason for the [adverse action]," the plaintiff "must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext"). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 174 (D. Conn. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

A.     **Prima Facie Claim of Disability Discrimination**

Defendant first argues that Plaintiff cannot establish a prima facie case of disability discrimination because it cannot "establish a causal connection between Valentino's disability and any purported adverse employment action by McLane." (Dkt. No. 45-1, at 10).[8] More specifically, Defendant argues that there is no evidence that Valentino was not interviewed or hired *because of* her disability, because "McLane had no knowledge that Valentino was deaf" when the decision was made not to interview or hire her. (*Id.*). Plaintiff responds that a reasonable jury could conclude that Defendant knew Valentino is deaf when it rejected her applications. (Dkt. No. 46, at 13–20).

As Defendant points out, courts regularly dismiss ADA disability discrimination claims where the plaintiff cannot establish that the employer had knowledge of the plaintiff's disability, on the ground that such a plaintiff cannot establish the causation element of a prima facie case. (*See* Dkt. No. 45-1, at 12–13 (collecting cases)). An employer "cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability," because an employer cannot take an adverse action with respect to an employee or applicant "*because of* a disability unless it knows of the disability." *Klemme v. W. Irondequoit Cent. Sch. Dist.*, 69 F. Supp. 3d 335, 340 (W.D.N.Y. 2014) (citations omitted); *see also, e.g.*, *Matya v. Dexter Corp.*, No. 97-cv-763, 2006 WL 931870, at *8, 2006 U.S. Dist. LEXIS 18358, at *23–24 (W.D.N.Y. Apr. 11, 2006) ("At the very least, for a plaintiff to show that he suffered an adverse employment action because of his disability, the employer must have knowledge of the alleged disability." (citation omitted)). "[A] plaintiff alleging discrimination on account of his protected status must offer evidence that a decision-maker was personally aware of his protected status to establish a

---

[8] Only the fifth causal connection element of the prima facie claim of disability discrimination is at issue here.

*prima facie* case of discrimination." *Murray v. Cerebral Palsy Ass'ns of N.Y., Inc.*, No. 16-cv-662, 2018 WL 264112, at *7, 2017 U.S. Dist. LEXIS 213553, at *19–20 (S.D.N.Y. Jan. 2, 2018) (citations omitted). Defendant argues that the evidence "plainly demonstrates" that it had no knowledge of Valentino's deafness when her applications were rejected, because (1) Orr—the decisionmaker—testified that she did not know Valentino is deaf until Valentino filed a charge of discrimination with the EEOC in August 2018; (2) the other three members of the Human Resources Department testified that they were not aware of Valentino's disability at the relevant time, did not speak to Valentino on the phone or recall a TRS call, and played no role in the hiring process; and (3) Valentino herself never expressly informed Defendant of her disability and does not know for sure whether the TRS operator did so. (Dkt. No. 45-1, at 10–12).[9] Plaintiff responds that a reasonable jury could find that Defendant knew Valentino is deaf at the time it rejected her applications based on the transcript of the TRS call and a reasonable inference that the employee who received that call informed Orr of Valentino's disability. (Dkt. No. 46, at 13–18).

Viewing the facts in the light most favorable to Plaintiff, the Court concludes that there is evidence from which a reasonable factfinder could conclude that Defendant had knowledge of Valentino's disability at the time it decided not to interview or hire her in March 2018. First, a reasonable factfinder could conclude, based on the transcript of the March 12 TRS call, that someone in McLane's HR department received the call. The McLane employee who originally answered the call, who worked in "claims customer service," indicated that she would transfer the call to Human Resources. (Dkt. No. 46-2, at 134 ("I will put you through.")). The transcript next indicates that a second employee answered the call; while nothing in the transcript

---

[9] It is undisputed that Valentino's applications did not indicate that she is deaf or has a disability.

13

definitively indicates that this employee worked in the HR department, the employee did have knowledge of Orr's whereabouts. (*Id.* ("I will have Ann[e] call or email[.] Right now she has a couple team[m]ates with her.")). Second, a reasonable factfinder could conclude that the second employee who answered the call learned—either expressly or by implication—that Valentino was deaf or hard of hearing. Although it is undisputed that Valentino herself never told McLane of her disability, the TRS call transcript indicates: "explaining relay." (*Id.*). While the content of the operator's explanation is unknown, Sprint operators were provided with two "guided training response[s]" consisting of scripted announcement and explanation combinations, one of which expressly references a person who is "deaf or hard of hearing." (Dkt. No. 46-2, at 109). The use of an announcement and explanation, coupled with the uniqueness and uncommonness of a TRS call, could be found to have put the employee on notice that Valentino was deaf or hard of hearing.[10]

A reasonable factfinder could further conclude that the employee who received the TRS call notified Orr of the call and put Orr on notice of Valentino's disability. According to the call transcript, the employee indicated that he or she would tell Orr about Valentino's call: "I will have Ann[e] call or email." (Dkt. No. 46-2, at 134). The employee appears to indicate familiarity with Orr's whereabouts and schedule. (*Id.*). Furthermore, Orr generally preferred to communicate with applicants by phone. (*See, e.g.*, Dkt. No. 45-16, at 28). Plaintiff therefore argues that Valentino's preference to be contacted by email, which a jury could infer was communicated by the employee to Orr, would have required elaboration or explanation, making

---

[10] This conclusion is buttressed by the fact that the transcript could be read as indicating that the employee who answered the call appeared flustered or confused by the call. For example, the employee refers to Valentino in the third person instead of speaking directly to her ("if Ann[e] calls *her* back"), and talks to herself at one point ("(talking to self)"). (Dkt. No. 46-2, at 134 (emphasis added)). The employee also said: "Um let me cause I know normal[l]y we just call[]. I[']m try[ing] to thin[k]." (*Id.*).

14

it more likely that Orr was informed about the TRS format of the call and why Valentino wanted to be contacted by email.

To be sure, such a conclusion would require that the factfinder draw a number of inferences in Plaintiff's favor. However, at the summary judgment stage, the Court is required to construe the record evidence in the light most favorable to Plaintiff as the non-moving party, and "resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.*, 352 F.3d at 780. Given the TRS call transcript, the conclusion that Defendant—and Orr in particular—had knowledge of Valentino's disability is not, as Defendant argues, based entirely on conjecture and speculation. *Cf. Volmar v. Cold Spring Hills Ctr. for Nursing & Rehab.*, No. 07-cv-1418, 2009 WL 2984194, at *4, 2009 U.S. Dist. LEXIS 84434, at *12–13 (E.D.N.Y. Sept. 14, 2009) (finding the plaintiff's claim that the defendant knew of her disability "completely conclusory" where the plaintiff "relie[d] on a picture of the Vice-President of North Shore Hospital shaking hands with the Vice-President of Cold Spring to support her accusation that [the two entities] were affiliated and thus Cold Spring learned of her HIV-positive status" from the hospital). Because a factfinder could draw reasonable inferences from the evidence to conclude that Orr was informed of the TRS call and put on notice of Valentino's disability, the Court cannot say as a matter of law that Plaintiff will not be able to establish a causal connection between Valentino's disability and Defendant's decision not to interview or hire her.

Accordingly, the Court concludes that Defendant is not entitled to summary judgment on the ground that Plaintiff cannot establish a prima facie claim of disability discrimination.

### B.  Legitimate, Non-Discriminatory Reason and Pretext

Defendant next argues that it is entitled to summary judgment because, even assuming Plaintiff can establish a prima facie case of disability discrimination, Defendant has met its burden of proffering a legitimate, non-discriminatory reason for not interviewing or hiring

Valentino. (Dkt. No. 45-1, at 18–23). Specifically, Defendant argues that it made the decision not to interview or hire Valentino because she was not as qualified as the individuals who were hired for the Warehouse Selector II and IV positions. (*Id.*). Plaintiff does not argue that Defendant has not met its burden of proffering a legitimate, non-discriminatory reason for not interviewing Valentino and rejecting Valentino's applications, but argues that a reasonable jury could find that the proffered reason is pretextual. (Dkt. No. 46, at 20–28).

As Defendant points out, courts have recognized the hiring of more qualified applicants as a legitimate, non-discriminatory reason for an employer's action. *See, e.g.*, *Tillery v. N.Y. State Office of Alcoholism & Substance Abuse Servs.*, No. 13-cv-1528, 2017 WL 2870502, at *10, 2017 U.S. Dist. LEXIS 103314, at *26 (N.D.N.Y. July 5, 2017) ("Seeking applicants with specific desired credentials is certainly a valid reason to hire one applicant over another, and has nothing to do with [the protected status]."); *Schupbach v. Shinseki*, 905 F. Supp. 2d 422, 431 (E.D.N.Y. 2012) (finding that the defendant had "put forth a legitimate, nondiscriminatory reason for why [the plaintiff] did not receive" either position, i.e., "that there were other candidates that were more qualified"). Defendant has provided the work experience of the applicants hired for the Warehouse Selector II and IV positions and asserts that the work experience made these applicants more qualified than Valentino. (*See* Dkt. No. 45-1, at 18–22).

Because Defendant has articulated a non-discriminatory explanation for its decision, Plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143. "An employee may satisfy this ultimate burden 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Meiri v. Dacon*, 759 F.2d 989, 997

16

(2d Cir. 1985) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)). The factfinder's "disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination" and, therefore, "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of discrimination" without additional proof of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The "key" is "whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue" of discrimination. *Griffith v. Metro. Transit Auth.-N.Y. City Transit*, No. 19-cv-6234, 2022 WL 16540877, at *4, 2022 U.S. Dist. LEXIS 196813, at *13 (S.D.N.Y. Oct. 28, 2022) (citation omitted).

Plaintiff first argues that a reasonable jury could find that Defendant's reasons for rejecting Valentino's applications were pretextual because its shifting definitions of "preferred qualifications" undermine its credibility. (Dkt. No. 46, at 20–23). The preferred qualifications at issue were developed by Orr to aid in her review of applications and were not in writing. (*See* Dkt. No. 45-16, at 20). Plaintiff notes that Defendant has described the preferred qualifications as "recent warehouse, labor-intensive, or fast-paced (such as fast-food, retail or production/factory) experience" but at other times has "dropped" the "recency" requirement. (*See* Dkt. No. 46, at 21–22 (citing, inter alia, Dkt. No. 45-5, at 4; Dkt. No. 45-9, at 5)). At her deposition, Orr testified that the recency of relevant and preferred work experience did not matter and that a gap in employment history was not determinative. (Dkt. No. 45-16, at 21; *see id.* at 52). The Court will not, however, second-guess Defendant's subjective preferences for particular work experience or other qualities in its job applicants, and concludes that minor variations in the articulation of preferred qualifications do not suffice to create a triable issue of fact. *See, e.g.*, *Dooley v. JetBlue*

17

*Airways Corp.*, 751 F. App'x 52, 54 (2d Cir. 2018) (summary order) (noting that the court "will not 'act as a super personnel department that second guesses [an employer's] business judgments'" (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e))).[11]

Plaintiff next argues that Defendant's stated reason is pretextual because (1) Valentino possessed preferred qualifications, (2) Defendant did not "follow its purported process of hiring individuals with 'preferred qualifications,'" and (3) Valentino had "better or comparable qualifications" than the individuals hired by Defendant. (Dkt. No. 46, at 23–28). As the Second Circuit has explained:

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

*Byrnie*, 243 F.3d at 103 (citation and internal quotation marks omitted). Indeed, the Court "must respect the employer's unfettered discretion to choose among qualified candidates." *Id.* (citation and internal quotation marks omitted).

---

[11] Moreover, Plaintiff cites cases where summary judgment was inappropriate in the face of an employer's shifting reasons for a particular employment decision. *E.g.*, *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (vacating grant of summary judgment where the employer "provided inconsistent explanations for its decision to terminate" the employee and noting that a reasonable juror "could infer that the explanations given by [the employer] at trial were pretextual, developed over time to counter the evidence suggesting age discrimination uncovered by the state investigation"); *Riley v. HSBC USA, Inc.*, 784 F. Supp. 2d 181, 210 (W.D.N.Y. 2011) ("Discrepancies between the reason a defendant provides in response to an EEOC discrimination charge, as compared to the reason asserted in employment discrimination litigation action[,] can support a reasonable jury's inference that one of the answers was false and, thus, a pretext for discrimination." (citing *Ethan Allen, Inc.*, 44 F.3d at 120)). As Defendant has consistently maintained that Valentino did not have preferred qualifications (and, by implication, that she was not as qualified as those individuals who were interviewed and hired), these cases are inapposite.

18

Here, even assuming that Valentino in fact possessed preferred qualifications or was just as or better qualified than other job applicants, as Plaintiff argues, there is no evidence from which a reasonable factfinder could conclude that her credentials were "so superior" to those of the individuals hired such that "no reasonable person" could have selected those individuals over Valentino. *Id.* It is undisputed that Valentino's applications disclosed work experience which (1) amounted to less than two years, (2) occurred between nine and fifteen years prior, and (3) consisted of office work and being a restaurant hostess and busser. (Dkt. No. 45-5, at 36). This experience is not markedly superior to that of the individuals hired. (*See* Dkt. No. 45-1, at 18–22 (setting forth the work experience of the 23 individuals hired for the Warehouse Selector II and IV positions)). For example, 22 of the 23 individuals hired had work experience at least as recent as 2017; the one exception had last worked in July 2016. (*Id.*). The Court is not in a position to evaluate whether Defendant accurately assessed the respective merits of the hundreds of job applications it received.[12] *See, e.g.*, *Syken v. New York*, 824 F. App'x 84, 85–86 (2d Cir. 2020) (summary order) ("[Plaintiff] quibbles that his supervisory experience was more relevant than that of the employee who was chosen; but the court must respect the employer's unfettered discretion to choose among qualified candidates." (citation and internal quotation marks omitted)).

However, Plaintiff does not rely solely on a discrepancy in qualifications to avoid summary judgment, but points to other evidence which could support a finding that Defendant's decision to reject Valentino's applications was because of her disability. First, it is undisputed that Orr called Valentino on March 12, 2018 regarding her applications. A jury could conclude

---

[12] It is not for this Court to say, for example, whether working "three months as a housekeeper" constitutes a preferred qualification, or whether work experience at McDonalds eight years prior is more desirable than hostess work almost ten years prior. (*See* Dkt. No. 46, at 26–27).

from this evidence that—despite any assessment of whether Valentino's applications reflected preferred qualifications—Orr was interested enough in Valentino's candidacy to follow up with a phone call to learn more. Second, as discussed above, there is evidence that Valentino returned Orr's call and evidence from which a reasonable factfinder could conclude that Orr was aware of the TRS call and of Valentino's disability. *Supra* Section IV.A. Third, the evidence reflects that Orr generally waited approximately "24 to 46 hours" or "a day or two" to hear back from an applicant she had called before "moving on." (Dkt. No. 45-16, at 36). However, Orr "dispositioned [Valentino] out" less than 24 hours after Orr called and left a voicemail. (*Id.*; Dkt. No. 45-5, at 29). Viewing this evidence in the light most favorable to Plaintiff and drawing all inferences in Plaintiff's favor, the Court concludes that a factfinder could reasonably conclude that Orr rejected Plaintiff's application earlier than she ordinarily would have because Orr learned of Valentino's disability and not because Orr did not hear back from her or Valentino's lack of preferred qualifications.

Thus, mindful of the "need for caution about granting summary judgment to an employer in a discrimination case where" there is a "dispute as to the employer's intent," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), the Court concludes that there is "sufficient evidence in the record" to allow a reasonable jury to find in Plaintiff's favor on the ultimate issue of discrimination on the basis of disability, *cf. Griffith*, 2022 WL 16540877, at *4, 2022 U.S. Dist. LEXIS 196813, at *13. Defendant is therefore not entitled to summary judgment.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 45) is **DENIED**.

**IT IS SO ORDERED.**

Dated: January 30, 2023

Brenda K. Sannes
Chief U.S. District Judge

20