**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                        5:20-cv-1628 (BKS/ML)

               Plaintiff,

v.

MCLANE/EASTERN, INC., *doing business as* McLane
Northeast,

               Defendant.

**Appearances:**

*For Plaintiff:*
Caitlin D. Brown
Kimberly Anne Cruz
Nora E. Curtin
Renay Michelle Oliver
33 Whitehall Street
New York, NY 10004

*For Defendant:*
Christopher J. Harrigan
Arianna E. Kwiatkowski
Benjamin M. Wilkinson
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

      Plaintiff, the United States Equal Employment Opportunity Commission ("EEOC"),

brought this action on behalf of Shelley Valentino against Defendant McLane/Eastern, Inc.,

doing business as McLane Northeast ("McLane"), asserting a claim for disability discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* (the "ADA"), as amended. (Dkt. No. 1). The case proceeded to a four-day trial held February 5, 2024, to February 8, 2024. The jury returned a verdict finding in favor of Plaintiff. (Dkt. No. 115). Presently before the Court is Defendant's motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or for a new trial or to vacate or remit the jury's damages awards pursuant to Rule 59 of the Federal Rules of Civil Procedure. (Dkt. No. 126). Also before the Court is Plaintiff's motion for equitable and injunctive relief. (Dkt. No. 125). The motions are fully briefed. (Dkt. Nos. 125-1, 126-7, 127, 128, 129, 130). For the reasons that follow, Defendant's motion is granted in part and denied in part, and Plaintiff's motion is granted in part and denied in part.

## II.    BACKGROUND

After the close of Plaintiff's case in chief, Defendant moved for judgment as a matter of law under Rule 50, arguing Plaintiff failed to establish that Valentino was not interviewed or hired because of her disability. (Dkt. No. 121, at 35). The Court reserved ruling on the motion, (*id.* at 38), and Defendant renewed its motion after the close of all evidence, (*id.* at 64). The Court denied Defendant's motion and submitted the case to the jury. (*Id.*). The jury returned a verdict finding for Plaintiff on both its failure to interview and failure to hire claims. (Dkt. No. 115, at 2). The jury found that Valentino suffered damages as a result of Defendant's discrimination and awarded her $25,000 for lost wages and benefits and $150,000 in nonpecuniary damages, i.e., "emotional pain, suffering" and "mental anguish." (*Id.* at 3). The jury also indicated that Plaintiff was entitled to punitive damages and awarded $1,500,000 in

punitive damages against Defendant. (*Id.* at 4). On February 9, 2024, the Clerk of Court issued judgment in favor of Plaintiff. (Dkt. No. 123). The instant motions followed.

## III.    DISCUSSION

### A.    Rule 50 Motion

#### 1.    Standard of Review

Under Rule 50 of the Federal Rules of Civil Procedure, a district court may grant a motion for judgment as a matter of law against a party if "a reasonable jury would not have a legally sufficient basis to find for the party" on a certain issue and "a claim or defense . . . can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a). Rule 50 "allows a district court to enter judgment as a matter of law if a jury returns a verdict unsupported by legally sufficient evidence." *Lee v. City of Troy*, 339 F.R.D. 346, 360 (N.D.N.Y. 2021). If a motion for judgment as a matter of law is made under Rule 50(a) and the court does not grant the motion before submission of the case to the jury, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion" upon its renewal after trial. Fed. R. Civ. P. 50(b). "In ruling on the renewed motion, the court may:[] (1) allow judgment on the verdict, if the jury returned a verdict;[] (2) order a new trial; or[] (3) direct the entry of judgment as a matter of law." *Id.*

A Rule 50(b) motion may be granted only "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (alterations in original) (quoting *Brady v. Wal-Mart Stores, Inc.* (*Brady I*), 531 F.3d 127, 133 (2d Cir. 2008)). "In

assessing the sufficiency of evidence to support a jury verdict, [a district court] must view the record in the light most favorable to the [nonmoving] party, assuming all reasonable inferences were drawn and all credibility disputes resolved in its favor." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004). "[A] jury may use a combination of factors—direct testimony, cross examination, and circumstantial evidence—to infer that a particular defendant took a particular action." *Gonzalez v. Waterbury Police Dep't*, 199 F. Supp. 3d 616, 621 (D. Conn. 2016), *as amended* (Aug. 9, 2016); *Medina v. Donaldson*, No. 10-cv-5922, 2014 WL 1010951, at *7, 2014 U.S. Dist. LEXIS 33723, at *22–24 (E.D.N.Y. Mar. 14, 2014) (collecting cases). "[C]ircumstantial evidence is of equal value to direct evidence[.]" *McFadden v. Cnty. of Monroe*, 672 F. App'x 81, 85 (2d Cir. 2016); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–100 (2003) ("We have often acknowledged the utility of circumstantial evidence in discrimination cases.").

The district court "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998); *see also Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005) (observing that, on a motion for judgment as a matter of law, the court "cannot weigh conflicting evidence, determine the credibility of witnesses, or substitute [its] judgment for that of the jury"). Although the court "should review the record as a whole," it should "give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (quoting 9A Charles Alan Wright & Arthur R. Miller, Fed. Practice & Proc. § 2529 (2d ed. 1995)).

2.    **Analysis**

Defendant argues that "the evidence presented at trial did not support a finding that [Plaintiff] had established a *prima facie* case of discrimination under the ADA[.]" (Dkt. No. 126-7, at 11). Specifically, Defendant argues, Plaintiff failed to establish that Defendant "failed to interview or hire Valentino **because of** her disability." (*Id.*). Defendant claims that Plaintiff offered no direct evidence to demonstrate that Valentino's call was ever transferred to its Human Resources Department, or that any of Defendant's employees ever knew that Valentino was deaf. (*Id.* at 12). Defendant argues that "no direct evidence of discrimination was presented at trial," and "the only evidence upon which the jury could have relied in deciding their verdict was circumstantial evidence." (*Id.* at 11-12).

At trial, Plaintiff elicited testimony about Valentino's applications to McLane for Warehouse Selector II and Warehouse Selector IV positions. (Dkt. No. 117, 66-67). Human Resources Manager Anne Orr called Valentino about her application only a few hours after receiving it. (Joint Ex. 7, ¶¶ 4, 10; Pl.'s Ex. P-15, at D00579). Valentino testified that she called Defendant back that same day, (Pl.'s Ex. 3), via Telephone Relay Service ("TRS"), (Dkt. No. 117, at 113-14).

Barbara Garcia, a business development manager for T-Mobile's IP relay[1] product and service, testified about the way a TRS call works. (*Id.* at 44-45). She explained that the TRS service is "an internet-based service" for people who are "deaf, hard of hearing, deafblind, or have a speech disability." (*Id.* at 44). The user "types what they want to say, and the operator reads it to a hearing party and everything spoken back is then typed back to the individual using the service." (*Id.* at 44-45). During a typical TRS call in 2018, the operator would have been

---

[1] IP relay is a form of TRS. (Dkt. No. 117, at 45).

trained to "announce the service as Sprint IP relay operator" and ask if the person receiving the call had ever received a relay call before. (*Id.* at 46-47). If the person was not familiar, the operator had "a scripted explanation of service[.]" (*Id.* at 47). The operator would explain that the caller was typing what they want to say which the operator would read aloud. (*Id.* at 48). The operator would further explain that when it was the other person's turn to respond, the operator would "say the words go ahead, or GA," and then type everything they heard back to the caller." (*Id.*). In 2018, a TRS user had the ability to save a transcript of their call at the end of the conversation. (Dkt. No. 117, at 50).

Valentino saved a transcript of her call to Defendant in a Word document after the call ended. (Dkt. No. 118, at 10). The transcript reflects that Valentino identified herself and then said that she had received "a call from McClane" and thought the call was about her application. (P's Ex. 3). The McClane operator said "it sounds like she may need the human resources department," and told Valentino that she would "put [her] through." (*Id.*). The person who answered Valentino's transferred call ("the recipient") did not appear to be familiar with TRS: she referred to Valentino in the third person as she spoke to the TRS operator. (*Id.*; *see also* Dkt. No. 117, at 102). The recipient asked the operator "does she know what position" she applied for. (P's Ex. 3). When Valentino answered that she had replied for Warehouse Selector II and IV, the recipient said "um let me causeI [sic] know normaly [sic] we just called," "I M tryiong [sic] to thing [sic] shoot… hold on just a moment and what's your name[.]" (*Id.*). Valentino provided her name. (*Id.*). The recipient then asked "if Ann calls her back does she call her [] phone number or how does that work?" (*Id.*). (Ann Orr was the Human Resources Manager at McClane.). Valentino asked if Ann could email her instead. (*Id.*). The recipient said "sure," and

took Valentino's email address. The recipient then said "I will have Ann call or email. Right now she has a couple teammates with her. I will have Ann email." (*Id.*).

Orr testified at trial that she never knew about the TRS call, and that no message was ever provided to her. (Dkt. No. 120, at 56). But Orr also testified that her assistants in HR were "very, very good" at giving her messages. (Dkt. No. 118, at 102). The HR assistants who worked at McClane in March 2018 testified that they were not aware of any TRS call. (Dkt. No. 121, at 20, 48–49, 57-58). However, one of the HR assistants testified at her deposition that she "talked to [Orr] briefly about" a TRS call, and that their discussion "about the use of a relay system" took place at some time "before [she] knew anything about Valentino and anything about this charge." (Dkt. No. 121, at 22-26).

Orr did not return Valentino's call; she rejected Valentino's application less than 24 hours after Valentino applied, (Dkt. Nos. 118, at 16-17; 119, at 76), even though Orr's usual practice was "to make sure that at least a full day had passed before rejecting the candidate," (Dkt. No. 119, at 24). Orr also admitted at trial that Valentino had preferred qualifications, (*id.* at 72), even though she previously claimed in her statement to the EEOC that Valentino was rejected for not meeting preferred qualifications, (*id.* at 22).

When Valentino reapplied for the Selector II and IV positions on March 22, 2018 and April 14, 2018, she was rejected again within one minute both times. (Dkt. No. 119, at 78-79). Each time Orr rejected Valentino's applications, Orr listed the reason as "Doesn't Meet Pref. Quals," (Pl.'s Ex. 14), even though she admitted at trial that wasn't true, (Dkt. No. 119, at 72).

Giving credence to this evidence, as the Court must, *see Reeves*, 530 U.S. at 151, and assuming all reasonable inferences were drawn and all credibility disputes resolved in Plaintiff's favor, *see Advance Pharm., Inc.*, 391 F.3d at 390, Defendants' argument fails. Here, the jury

could conclude—based on Valentino's testimony, the fact of (and the transcript from) her TRS

call with Defendant, and Orr's testimony that her assistants were "very, very good" at

transmitting her messages—that Defendant knew Valentino was a person with a disability. The

jury could also conclude that Defendant failed to interview or hire Valentino *because of* her

disability, based on Orr's testimony that she called Valentino about her application only a few

hours after receiving it, but then never returned Valentino's call after the TRS call and rejected

Valentino less than 24 hours after Orr's call to Valentino—even though (1) Orr admitted

Valentino had preferred qualifications and (2) Orr's usual practice was to allow more time for

candidates to respond to her calls. Thus, the evidence at trial provided a legally sufficient basis

for the jury's verdict against Defendant. Defendant's motion for judgment as a matter of law is

therefore denied.

### B.    Rule 59 Motion

#### 1.    Standard of Review

Under Rule 59(a) of the Federal Rules of Civil Procedure, a court may "grant a new trial

. . . for any reason for which a new trial has heretofore been granted in an action at law in federal

court." In determining whether to grant a new trial under Rule 59, the court must consider

whether "the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of

justice." *See Stampf v. Long Island R.R.*, 761 F.3d 192, 202 (2d Cir. 2014) (alteration in original)

(quoting *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005)). "A court considering a

Rule 59 motion for a new trial must bear in mind . . . that the court should only grant such a

motion when the jury's verdict is 'egregious.'" *DLC Mgmt. Corp. v. Town of Hyde Park*, 163

F.3d 124, 134 (2d Cir. 1998) (quoting *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d

Cir. 1992)).

Under Rule 59, a court may also order "a new trial limited to damages" or, under the practice of remittitur, "condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *See Echevarria v. Insight Med., P.C.*, 72 F. Supp. 3d 442, 466 (S.D.N.Y. 2014) (quoting *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996)). "The Second Circuit has identified 'two distinct kinds of cases' in which conditional remittitur is appropriate: (i) when the court discerns 'an error that caused the jury to include in the verdict a quantifiable amount that should be stricken' or (ii) when the award is 'intrinsically excessive' in the sense that no reasonable jury could have awarded the amount, whether or not the excessiveness can be attributed to 'a particular, quantifiable error.'" *Id.* (quoting *Kirsch v. Fleet St. Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998)). A jury's verdict should be set aside as "'intrinsically excessive' only if 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Id.* (quoting *Kirsch*, 148 F.3d at 165).

In general, "on a Rule 59 motion the court 'may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.'" *Id.* (quoting *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014)). However, in determining whether the jury awarded excessive damages, the court must "view the evidence and draw all factual inferences in favor of [the verdict winner]' and . . . 'accord substantial deference to the jury's determination of factual issues." *Dancy v. McGinley*, 843 F.3d 93, 99 (2d Cir. 2016) (quoting *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir. 1993)).

## 2.     Statutory Cap

As a preliminary matter, Defendant argues that "the jury's total award of compensatory and punitive damages totaling $1.65 million exceeds the applicable statutory limit," because

compensatory damages against an employer of Defendant's size are limited to $300,000.[2] (Dkt. No. 126-7, at 16) (citing 42 U.S.C. § 1981(b)(3)(D)). Indeed, under 42 U.S.C. § 1981a(b)(3)(D), "[t]he sum of the amount of compensatory damages awarded . . . and the amount of punitive damages awarded under this section, shall not exceed [] $300,000" for a Defendant "who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year." Plaintiff "acknowledges that the Civil Rights Act of 1991 caps compensatory and punitive damages in this action at a combined $300,000 for an employer of Defendant's size," and "does not object to this reduction[.]" (Dkt. No. 128, at 23). However, Plaintiff asserts that "no further reduction is warranted," and Defendant's motion "should be denied to the extent it requests a further reduction." (*Id.*). Therefore, the Court must determine whether further reduction below the statutory cap is appropriate.

### 3.    Valentino's Compensatory Damages

Defendant asserts that the jury's award of $150,000 "in non-pecuniary damages related to Valentino's emotional distress is excessive and must be reduced accordingly." (Dkt. No. 126-7, at 17). Specifically, Defendant argues that "Valentino did not offer any evidence of medical treatment or testimony from a medical provider." (*Id.*). Defendant also claims that Valentino experienced some of her symptoms "*prior* to her rejection from McLane." (*Id.*). According to Defendant, "Valentino's emotional distress claim is clearly one for garden variety damages," and "the jury's award of $150,000 in emotional distress damages exceeds that of garden variety cases within the Second Circuit." (*Id.* at 20).

---

[2] The statutory cap applies to the total "amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages[.]" 42 U.S.C.A. § 1981a(b)(3)(D). The $25,000 awarded by the jury for lost wages and benefits ("backpay") is not included in the cap, and the parties do not dispute the backpay award.

Plaintiff appears to concede that Valentino's claims are for "garden variety" damages, but counters that Defendant "cannot identify a specific error" in the jury's verdict, and that the $150,000 verdict "does not shock the conscience." (Dkt. No. 128, at 24). Plaintiff acknowledges that awards for garden variety emotional distress damages "generally merit $30,000 to $125,000," (*Id.* at 24-25 (citing Dkt. No. 126-7, at 19)), but notes that "courts have upheld awards outside that range" based on evidence similar to the evidence presented in this case, (*id.* at 25).

"In determining whether a particular award is excessive, courts have reviewed awards in other cases involving similar injuries, 'bearing in mind that any given judgment depends on a unique set of facts and circumstances.'" *Scala*, 985 F.2d at 684 (quoting *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir.1988)); *see also White v. New York State Off. of Child. & Fam. Servs.*, No. 11-cv-309, 2021 WL 282561, at *3, 2021 U.S. Dist. LEXIS 16061, at *5 (N.D.N.Y. Jan. 28, 2021) ("To decide what an appropriate award should be, the court must consider awards granted in comparable cases, while recognizing that 'no two cases are exactly alike[.]'" (quoting *Dotson v. City of Syracuse*, No. 04-cv-1388, 2011 WL 817499, *14, 2011 U.S. Dist. LEXIS 20374, at *36 (N.D.N.Y. Mar. 2, 2011) (additional internal citations omitted))). A court's "task is not to balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater," but to "inquire whether the verdict "is within reasonable range." *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990).

"In this circuit, emotional distress awards can generally be grouped into three categories of claims: garden-variety, significant, and egregious." *United States v. Asare*, 476 F. Supp. 3d 20, 37 (S.D.N.Y. 2020) (quoting *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018)). "For 'garden variety' emotional distress claims, the evidence of mental

11

suffering is generally limited to the testimony of the plaintiff, who describes [their] injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Id.* Garden-variety claims "typically lack extraordinary circumstances and are not supported by any medical corroboration." *Id.* These claims "generally merit $30,000.00 to $125,000.00 awards." *Id.*; *see also Nnebe v. Daus*, No. 06-cv-4991, 2024 WL 4182600, at *5, 2024 U.S. Dist. LEXIS 164922, at *17 (S.D.N.Y. Sept. 13, 2024) ("Because such harm is uncorroborated and not particularly severe, the damages awarded for garden variety emotional distress are fairly modest, 'generally' ranging from '$30,000 to $125,000.'" (quoting *MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012))). However, $125,000 is not a "hard cap," and courts have been willing to uphold higher verdicts. *See Monette v. Cnty. of Nassau*, No. 11-cv-539, 2015 WL 1469982, at *20, 2015 U.S. Dist. LEXIS 42523, at *63-64 (E.D.N.Y. Mar. 31, 2015) ("The $150,000 award here does not shock the Court's conscience. Even defendants concede that the general range of awards in similar cases extends at least to $125,000, and the Second Circuit affirmed the award of up to $125,000 in mental anguish damages where there was no evidence of physical sequelae or professional treatment. Thus, the award in this case is quite close to what is often approved, and $125,000 is not a hard cap in cases of this type." (internal citations and quotations omitted)).

"Emotional distress damages are available even where the plaintiff has not sought medical treatment or the distress does not manifest in physical symptoms." *Asare*, 476 F. Supp. 3d 20, 37 (S.D.N.Y. 2020) (quoting *Saber v. N.Y. State Dep't of Fin. Servs.*, No. 15-cv-5944, 2018 WL 3491695, at *12, 2018 U.S. Dist. LEXIS 121811, at *35 (S.D.N.Y. July 20, 2018)). However, while "there is no requirement that a plaintiff introduce medical or expert testimony regarding his damages, the court must consider the lack of such evidence when assessing

whether the award is reasonable." *White*, 2021 WL 282561, at *3, 2021 U.S. Dist. LEXIS 16061, at *5. And although "a jury has broad discretion in measuring damages, it 'may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket.'" *Id.* (quoting *Dotson*, 2011 WL 817499, at *13, 2011 U.S. Dist. LEXIS 20374, at *35).

Valentino testified at trial that she experienced some anxiety "a few years" prior to her experience with McLane, but that her anxiety "increased dramatically" after McLane rejected her on March 13, 2018. (Dkt. No. 118, at 62). Valentino felt that her prior work experience had prepared her for the jobs she applied for at McLane, (Dkt. No. 117, at 70), and that the Selector II or IV positions "would be a good fit" for her, (*id.* at 66). They were entry-level jobs. (Dkt. No. 118, at 110). Even so, Valentino had previously worked in a warehouse, (*id.* at 68-69), at a restaurant, (*id.* at 71-72), and when she had her son, she was a busy stay-at-home mom and a college student, (*id.* at 75-76). When McLane rejected her for these entry-level positions, her "self-esteem was more deflated[.]" (Dkt. No. 118, at 22). She "felt hopeless," and she felt that she couldn't "provide for her family." (*Id.*). She "couldn't sleep well at night," and "[s]ometimes [she] would stay up all night." (*Id.*) She admitted that she woke up in the middle of the night before her rejection, but only twice a month. (*Id.* at 23-24). After her rejection, she woke up three times a week. (*Id.* at 24). Valentino experienced a racing heartbeat and was diagnosed with heart palpitations in 2021, and she testified that she believed McLane's rejection in 2018 "was part of it." (*See id.* at 65).

Defendant points to eight cases in support of its argument that the jury's verdict was excessive on these facts. (*See* Dkt. No. 126-7, at 20-22). Of those eight cases, one was ultimately reversed on the preliminary issue of liability, *see Kinneary v. City of New York*, 536 F. Supp. 2d

326 (S.D.N.Y. 2008), *rev'd*, 601 F.3d 151 (2d Cir. 2010)), and three are more than twenty years old, *see Mcintosh v. Irving Trust Co.*, 887 F. Supp. 662 (S.D.N.Y. 1995); *Norville v. Staten Island University Hosp.*, 2003 U.S. Dist. LEXIS 28399 (E.D.N.Y. 2003); *Ortiz-Dei Valle v. Nat'l Basketball Assoc.*, 42 F. Supp. 2d 334 (S.D.N.Y. 1999). *See Claud v. Brown Harris Stevens of Hamptons, LLC*, 676 F. Supp. 3d 100, 139 (E.D.N.Y. 2023) (noting that an award for emotional distress that "directly track[ed]" comparable, older cases "would not account for the effects of inflation in intervening years"). The remaining four are cases in which magistrate judges estimated damages upon one party's default, rather than cases in which a jury rendered a verdict. *See Manswell v. Heavenly Miracle Acad. Servs.*, No. 17-cv-7114, 2017 WL 9487194, 2017 U.S. Dist. LEXIS 136366 (E.D.N.Y. Aug. 23, 2017), *report and recommendation adopted*, No. 14-cv-7114, 2017 WL 4075180, 2017 U.S. Dist. LEXIS 149287 (E.D.N.Y. Sept. 14, 2017); *Munson v. Diamond*, No. 15-cv-0425, 2017 WL 4863096, 2017 U.S. Dist. LEXIS 85143 (S.D.N.Y. 2017), *report and recommendation adopted*, 2017 WL 4862789,  (S.D.N.Y. Oct. 23, 2017), *Manson v. Friedberg*, No. 08-cv-3890, 2013 WL 2896971, 2013 U.S. Dist. LEXIS 83488 (S.D.N.Y. June 13, 2013)2017 U.S. Dist. LEXIS 177971 (S.D.N.Y., Oct. 23, 2017); *Drice v. My Merch. Servs., LLC*, No. 15-cv-0395, [WESTLAW], 2016 U.S. Dist. LEXIS 29006, *18 (E.D.N.Y. 2016), *report and recommendation adopted*, 2016 WL 1266948, 2016 U.S. Dist. LEXIS 42779 (E.D.N.Y. Mar. 31, 2016). These cases are less compelling than cases involving a remittitur of a jury award, where the verdict may only be set aside if it "shocks the judicial conscience." *See Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 334 (S.D.N.Y. 2016) ("[C]ases in which a court has estimated damages after a default are less persuasive here than cases that involve remittiturs of jury awards.").

Plaintiff cites to *Monette*, 2015 WL 1469982, at *20, 2015 U.S. Dist. LEXIS 42523, at *63-64, where the court found the award of $150,000 did not shock the judicial conscience. In *Monette*, as here, the plaintiff's testimony was the sole evidence of his emotional distress. *Id.*, 2015 WL 1469982, at *20-21, 2015 U.S. Dist. LEXIS 42523, at *64. The plaintiff testified that he experienced "trouble sleeping and eating" in the months following his firing, and he "felt humiliated and sick." *Id.*, 2015 WL 1469982, at *5, 2015 U.S. Dist. LEXIS 42523, at *13. The court declined to remit the verdict, reasoning that "the jury's award was not conscience-shocking or excessive, but rather was reasonably based upon plaintiff's testimony regarding his emotional distress." *Id.*, 2015 WL 1469982 at *21, 2015 U.S. Dist. LEXIS 42523, at *65.

Plaintiffs also cite to *Figueroa v. KK Sub II, LLC*, No. 15-cv-6526, 2019 WL 1109864, 2019 U.S. Dist. LEXIS 38451 (W.D.N.Y. Mar. 11, 2019). In *Figueroa*, a sexual harassment and retaliation case, the court declined to disturb a verdict of $150,000 where the only evidence of plaintiff's emotional distress was the testimony of plaintiff and her mother. *Id.*, 2019 WL 1109864, at *6; 2019 U.S. Dist. LEXIS 38451, at *15-18. The plaintiff testified that she had her first anxiety attack after she was fired, and that she took medications that made her feel sick. *Id.* She testified about her financial stress, and how "she could not care for her children for a few months after she was fired because she was depressed[.]" *Id.* Applying the less-deferential New York state law standard of review,[3] the court nevertheless declined to reduce the $150,000 compensatory award because it was not "convinced that the jury's award is entirely out of proportion" to the plaintiff's injury. *Id.* (quoting *Bouveng*, 175 F. Supp. 3d at 328-29).

---

[3] In *Figueroa*, because the compensatory damages at issue were allocated to the plaintiff's state law claim, the court reviewed "the award under state law and consider[ed] whether it 'deviate[d] materially from what would be reasonable compensation," a standard it described as "less deferential to a jury verdict" than the "shocks the conscience standard generally applied by the federal courts." *Figueroa*, 2019 WL 1109864, at * 5, 2019 U.S. Dist. LEXIS 35451, at *13-14 (quotation omitted).

In light of this evidence, and upon review of the caselaw, the Court cannot find that the award of compensatory damages against McLane is "so high as to shock the judicial conscience and constitute a denial of justice." *See Echevarria*, 72 F. Supp. 3d at 466. There are several cases within this Circuit finding comparable or higher damages awards to be reasonable for garden variety emotional distress. *See Bouveng*, 175 F. Supp. 3d at 334 (ordering remittitur of $500,000 jury award to $150,000 where "much of Plaintiff's testimony regarding her emotional distress" was vague or conclusory, plaintiff "offered no medical corroboration for her emotional distress," and there was "almost no evidence of any sort that [p]laintiff suffered any long-term emotional distress"); *Quinby v. WestLB AG*, No. 04-cv-7406, 2008 WL 3826695, at *4, 2008 U.S. Dist. LEXIS, at *9-10 (S.D.N.Y. Aug. 15, 2008) (ordering remittitur of $500,000 compensatory damages award to $300,000 for garden variety emotional distress, noting that $300,000 was "at or above the upper range of reasonableness"). Mindful of the "extraordinarily high standard" that must be met before the Court may overturn a jury award, the Court declines to grant Defendant's motion on the issue of compensatory damages. *See Phillips v. Bowen*, 278 F.3d 103, 111-112 (2d Cir. 2002) (noting that "those hearing [the] evidence at trial" are in the best position to evaluate witness credibility).

### 4. Punitive Damages

Defendant argues that Plaintiff "failed to submit evidence to support an award of punitive damages." (Dkt. No. 126-7, at 22). Alternatively, Defendant asserts that the award is excessive. (*Id.* at 22-23). Plaintiff disagrees, claiming that it presented sufficient evidence to merit an award of punitive damages, and that the award was not excessive under the factors set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). (Dkt. No. 128, at 28). Plaintiff argues that the

Court should set punitive damages that, together with its compensatory damages, "meet the $300,000 threshold." (Dkt. No. 128, at 27).

"An award of punitive damages in an ADA case requires a showing 'that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Brady I*, 531 F.3d at 137 (quoting 42 U.S.C. § 1981a(b)(1)). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999)). "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad*, 527 U.S. at 536. A plaintiff may meet that burden by proving that a defendant had knowledge that it may be acting in violation of federal law. *Brady v. Wal-Mart Stores, Inc.* (*Brady II*), 455 F. Supp. 2d 157, 177 (E.D.N.Y. 2006), *aff'd*, 531 F.3d 127 (2d Cir. 2008). And, knowledge of a plaintiff's rights "can reasonably be inferred from 'the well-established Supreme Court case law on discrimination and retaliation, the long standing statutory schemes proscribing such conduct, the size of [the defendant], and the common knowledge in today's society that employment discrimination is impermissible.'" *Norris v. N.Y.C. Coll. of Tech.*, No. 07-cv-853, 2009 WL 82556, at *6, 2009 U.S. Dist. LEXIS 3186, at *18 (E.D.N.Y. Jan. 14, 2009) (quoting *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2002)).

"One of the purposes of punitive damages is to deter future conduct by inflicting a noticeable financial impact." *Luciano v. Olsten Corp.*, 912 F. Supp. 663, 672 (E.D.N.Y. 1996). As such, courts may take notice of a defendant's financial circumstances when considering the appropriate amount of punitive damages. *See, e.g.*, *Barham v. Wal-Mart Stores, Inc.*, No. 3:12-

cv-01361, 2017 WL 3736702, at *5, 2017 U.S. Dist. LEXIS 139565, at *13 (D. Conn. Aug. 30, 2017) ("The Court notes that Walmart is an employer whose size far exceeds the maximum contemplated by this statute, suggesting that even a punitive damages award far above this maximum would not necessarily 'shock the judicial conscience' in light of Walmart's size and its conduct in this case. (quoting *Lore v. City of Syracuse*, 670 F.3d 127, at 177 (2d Cir. 2012))); *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 414 (S.D.N.Y. 1996) ("Because punitive damages are designed to serve a deterrent function, they must take into account the financial circumstances of the defendant."). "[O]nly where an award would shock the judicial conscience and constitute a denial of justice, for example because it would result in financial ruin of the defendant or constitute a disproportionately large percentage of a defendant's net worth and thereby violate due process, should the court reduce an award of punitive damages to below the appropriate cap." *Figueroa*, 2019 WL 1109864, at *7, 2019 U.S. Dist. LEXIS 38451, at *19 (quoting *Kennedy v. Supreme Forest Prods., Inc.*, No. 18-cv-221, 2019 WL 459755, at *3, 2019 U.S. App. LEXIS 3635, *77 (2d Cir. Feb. 6, 2019)). Nevertheless, "punitive damages may not be grossly out of proportion to the severity of the offense." *Gore*, 517 U.S. at 576 (internal quotation omitted).

In reviewing a jury's award of punitive damages, a court is guided by three factors identified by the Supreme Court in *Gore*: "(1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) 'the difference between this remedy and the . . . penalties authorized or imposed in comparable cases.'" *See Stampf*, 761 F.3d at 209 (quoting *Gore*, 517 U.S. at 575).

### a.    Sufficiency of the Evidence

Preliminarily, the Defendant's argument that Plaintiff failed to submit evidence to

support an award of punitive damages fails. Defendant argues that "the record before the Court is

devoid of any egregious or outrageous actions toward Valentino," and that the EEOC "presented

absolutely no evidence regarding Orr's state of mind to suggest that she acted with malice or

reckless indifference." (Dkt. No. 126-7, at 22). But Plaintiff need not show that Defendant acted

egregiously or outrageously; Plaintiff can meet its burden by showing that Defendant had

knowledge that it may be acting in violation of federal law. *See Brady II*, 455 F. Supp. 2d at 177

("The law permitted [the plaintiff] to meet [his] burden by proving that Wal–Mart had

knowledge that it 'may be acting in violation of federal law'—it did not require him to

demonstrate Wal–Mart had a contemporaneous 'awareness that it [was] engaging in

discrimination.'" (quoting *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 235 (2d

Cir.2000))).

Orr testified at trial that she had been working in Human Resources for "well over 20

years" as of 2018, and that she had a degree in Human Resources. (Dkt. No. 118, at 81-82). Orr

also testified that she was familiar with the ADA and its requirements. (*Id.* at 97). From that

information, the jury could reasonably infer Orr's knowledge of Valentino's rights as a person

with a disability. *See Norris*, 2009 WL 82556, at *6, 2009 U.S. Dist. LEXIS 3186, at *18

(E.D.N.Y. Jan. 14, 2009). And, as explored above, the evidence supports the jury's determination

that Defendant knew Valentino was a person with a disability, and that Defendant failed to

interview or hire Valentino *because of* her disability. *See* discussion *infra* Section III.A.

Altogether, this evidence is sufficient to demonstrate that Defendant discriminated against

Valentino "in the face of a perceived risk that its actions will violate federal law to be liable in

19

punitive damages." *See Kolstad*, 527 U.S. at 536. Therefore, the evidence at trial was sufficient to support an award of punitive damages. *See Norris*, 2009 WL 82556, at *6, 2009 U.S. Dist. LEXIS 3186, at *18 (upholding award of punitive damages where plaintiff was terminated by "a sophisticated and experienced college administrator who squarely testified that he knew that discrimination and retaliation in employment were against the law").

Because the Court has declined to remit Plaintiff's compensatory damages, and the combination of compensatory and punitive damages cannot exceed the statutory cap of $300,000, the punitive damages award must be reduced *ab initio* to $150,000. The Court proceeds to examine the *Gore* factors to determine whether further reduction is warranted – bearing in mind that the Court should only reduce the award of punitive damages to below the statutory cap if the remaining amount "shock[s] the judicial conscience." *See Figueroa*, 2019 WL 1109864, at *7, 2019 U.S. Dist. LEXIS 38451, at *19.

### b.      Degree of Reprehensibility

The "'degree of reprehensibility of the defendant's conduct' [i]s '[p]erhaps the most important indicium of the reasonableness of a punitive damages award.'" *Stampf*, 761 F.3d at 209 (second alteration in original) (quoting *Gore*, 517 U.S. at 575). "In assessing reprehensibility, [courts] consider both the defendant's conduct and its natural consequences." *Id.* In assessing reprehensibility, courts look to certain "'aggravating factors' that are 'associated with particularly reprehensible conduct,' which include '(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct.'" *Saleh v. Pretty Girl, Inc.*, No. 09-cv-1769, 2022 WL 4078150, at *28,

2022 U.S. Dist. LEXIS 160952, at *86-87 (E.D.N.Y. Sept. 6, 2022) (quoting *Lee v. Edwards*, 101 F.3d at 809).

While Defendant's conduct certainly did not present a threat of violence, the jury may have inferred some degree of "deceit" from Orr's testimony at trial—including her admission that (contrary to her signed statement to the EEOC) Valentino *did* possess preferred qualifications for the jobs to which she applied. (*See* Dkt. No. 119 at 22, 72). Orr also testified that she called Valentino "because there were gaps on her application and [she] wanted to know more," (*id.* at 92), but later admitted she didn't remember calling Valentino specifically, (Dkt. No. 120, at 73). And Orr claimed she placed Valentino's application "on hold" because she needed more information, (*id.* at 33), but later, again, admitted that she actually rejected Valentino's application less than 24 hours after she applied, (*id.* at 75). *See Theodat v. City of New York*, No. 16-cv-3977, 2019 WL 4385794, at *8, 2019 U.S. Dist. LEXIS 157274, at *20 (E.D.N.Y. Sept. 13, 2019), *aff'd*, 818 F. App'x 79 (2d Cir. 2020) (finding evidence that perpetrating witness "was lying when he testified that he did not remember the events of [the relevant] night" sufficient to demonstrate malice or deceit). *Cf. Tse v. UBS Fin. Servs.*, 568 F. Supp. 2d 274, 312-13 (S.D.N.Y. 2008) (remitting $3 million punitive damage award to $300,000 where there was very limited evidence of reprehensibility). Thus, the first *Gore* factor supports the jury's award of punitive damages.

### c.    Ratio of Punitive Damages to Actual Harm

The Supreme Court has not "draw[n] a mathematical bright line" between acceptable and unacceptable ratios for punitive damages, *see Gore*, 517 U.S. at 582, but "the Supreme Court has upheld a punitive damage award of 'more than 4 times the amount of compensatory damages,'" *see Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006) (quoting *Pac. Mut. Life Ins. Co. v.*

*Haslip*, 499 U.S. 1, 23–24 (1991)). Indeed, the Supreme Court relied upon "the longstanding historical practice of setting punitive damages at two, three, or four times the size of compensatory damages." *See Philip Morris USA v. Williams*, 549 U.S. 346, 351 (2007); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 410 (2003) ("Single-digit multipliers are more likely to comport with due process[.]"). "In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. Only in 'breathtaking' cases, where, for example, the ratio is 500 to 1, is remittitur appropriate. *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 589 (S.D.N.Y. 2010) (internal quotations and citations omitted) (quoting *Gore*, 517 U.S. at 582-83).

Here, the punitive award—reduced to the maximum allowable amount of $150,000, under the statutory cap—is equivalent to the compensatory award. Courts have upheld much higher awards, and have even reduced punitive awards to equal compensatory awards where they find a verdict to be excessive. *See, e.g., Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 148-49 (2d Cir. 2010) (affirming remittitur from $1.6 million to $190,000 where defendant's conduct, "though undeniably reprehensible, was insufficiently reprehensible to justify a punitive damages award in significant excess of his compensatory damages award"); *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 331 (S.D.N.Y. 2018) (remitting $750,000 punitive damages award to $125,000, equal to the compensatory damages award). Therefore, the second *Gore* factor supports the jury's award of punitive damages.

### d. Difference Between Punitive Damages and Penalties Authorized or Imposed in Comparable Cases

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore*, 517 U.S. at 583. "[T]he Second Circuit has further 'found it helpful in deciding whether a particular

punitive award is excessive to compare it to court rulings on the same question in other cases.'"
*Jackson v. Tellado*, 2018 WL 4043150, at *7, 2018 U.S. Dist. LEXIS 145339, at *20–21
(quoting *Payne v. Jones*, 711 F.3d 85, 104 (2d Cir. 2013).

Defendants have provided, and the Court has found, only one case in the Second Circuit
involving a remittitur in a failure-to-hire case. *See Ortiz-De Valle*, 42 F. Supp. 2d 334. In that
case, which is more than twenty years old, the court concluded that a punitive damages award of
$7 million dollars was excessive. *Id.* at 347. The punitive award was reduced to $250,000, which
was "the maximum award of punitive damages that would not be excessive[.]" *Id.* Punitive
damages in other cases fall within a broad range, and $150,000 is not an exorbitant award in an
employment discrimination context. *See, e.g., Barham,* 2017 WL 3736702, at *5, 2017 U.S. Dist.
LEXIS 139565, at *14 (reducing $5 million punitive damages award to $175,000, such that total
compensatory and punitive damage met $300,000 statutory cap); *Kuper v. Empire Blue Cross &
Blue Shield*, No. 99-cv-1190, 2003 WL 359462, at *11, 2003 U.S. Dist. LEXIS 2362, at *26
(S.D.N.Y. Feb. 11, 2003) (declining to remit $200,000 punitive damages award, taking note of
Defendant's size and wealth); *Figueroa*, 2019 WL 1109864, at *8, 2019 U.S. Dist. LEXIS
38451, at *22 (declining to remit $200,000 punitive damages award, and noting that because of
the statutory cap 'the amount awarded is not out of line with awards in similar cases or
comparable penalties authorized by law'" (quoting *Oliver v. Cole Gift Ctrs., Inc.*, 85 F. Supp. 2d
109, 115 (D. Conn. 2000))).

With all three *Gore* factors satisfied, the Court cannot find that the award of $150,000 in
punitive damages shocks the judicial conscience. Therefore, the Court declines to grant
Defendant's motion on the issue of punitive damages.

### C.    Motion for Permanent Injunction

### 1.    Standard of Review

"An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). A permanent injunction must be "narrowly tailored to fit specific legal violations." *Hernandez v. Enfield Bd. of Educ.*, No. 19-cv-1907, 2024 WL 3011177, at *3, 2024 U.S. Dist. LEXIS 105944, at *8 (D. Conn. June 14, 2024) (quoting *Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir. 1994)). "An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011).

Under the ADA's enforcement provisions, 42 U.S.C. § 12117(a), "injunctive relief may be an appropriate remedy when the court determines that an employer 'has intentionally engaged in or is intentionally engaged in such unlawful employment practice charged in the complaint[.]'" *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 211 (E.D.N.Y. 2018) (quoting 42 U.S.C. § 2000e-5). "[T]he Supreme Court has held that 'the (district) court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future" when federal anti-discrimination laws are found to be violated. *Equal Emp. Opportunity Comm'n v. AZ Metro Distribs., LLC*, No. 15-cv-05370, 2020 WL 7404432, at *13, 2020 U.S. Dist. LEXIS 237752, at *35 (E.D.N.Y. Dec. 16, 2020) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)).

"The factors [that] are pertinent in assessing the propriety of injunctive relief" in the employment discrimination context are "the balance of equities and consideration of the public

interest." *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012) (quoting *Winter*, 555 U.S. at 32). To succeed, "[t]he moving party must demonstrate that 'there exists some cognizable danger of recurrent violation.'" *See United Health Programs*, 350 F. Supp. 3d 199, 211 (E.D.N.Y. 2018) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). Further, "[a] court may grant injunctive relief even where a defendant has ceased the offending conduct[.]" *Id.* (citing *W.T. Grant*, 345 U.S. at 633). "In determining whether to impose an injunction where a defendant has ceased the offending conduct, courts may consider 'the bona fides of the [defendant's] expressed intent to comply' with the law, 'the effectiveness of the discontinuance,' and 'the character of the past violations.'" *KarenKim*, 698 F.3d at 100 (quoting *W.T. Grant*, 345 U.S. at 633).

### 2.    Availability of Injunctive Relief

Plaintiff seeks injunctive relief "designed to deter and prevent McLane from engaging in future disability discrimination." (Dkt. No. 125-1, at 6). The EEOC has submitted a proposed Order Granting Injunctive Relief, (Dkt. No. 129-1), to remain in effect for five years, (*id.* at 7), which requires Defendant to, among other things, revise its anti-discrimination policies, report to the EEOC, and provide disability training to its employees, (*see generally* Dkt. No. 129-1). Defendant opposes Plaintiff's motion and proposed order, arguing that Plaintiff has not presented evidence of a high danger of recurrent violation—particularly because Orr no longer works for McLane. (Dkt. No. 127, at 8-9). Defendant argues that "this case, at best, involves an isolated incident of discrimination, with little risk of reoccurrence." (*Id.* at 10). McLane further argues that the relief sought is not narrowly tailored, (*Id.* at 11-13), and that the balance of the equities disfavors injunctive relief because "the burden the EEOC seeks to impose upon McLane is

relatively significant," (*Id.* at 14). Plaintiff disagrees, noting that Defendant has offered no evidence of an effort to prevent future violations of the ADA. (Dkt. No. 129, 5-13).

At trial, Orr testified that she was employed at the McLane Northeast facility in Baldwinsville for six and a half years, starting in 2015. (*See* Dkt. No. 118, at 81). She began as a Human Resources Manager, and by the time she left she was a Senior Human Resources Manager. (*Id.*). She estimated that approximately 630 to 650 people were employed at McLane Northeast in 2018, with approximately 25 to 30 distribution centers across the country. (*Id.* at 79-80). Orr believed there were probably 15,000 to 18,000 McLane employees across the country, and that it was a profitable organization. (*Id.* at 217-18). She estimated that McLane made $50 million in profit a year while she was a McLane employee. (*Id.*)[4]

In 2018, Orr was a managing member of the leadership team at McLane Northeast and was responsible for staffing. (*Id.* at 82). Orr would have handled employee requests for accommodations related to a disability. (*Id.* at 85). Orr said that at that time, there was no general training for employees with respect to the ADA, though there was information in the employee handbook about "equal treatment." (*Id.* at 86). She stated that the people who worked in HR "probably" had a training on the ADA when they were hired, but that she did not get any training on the ADA other than the "day one orientation-type information[.]" (*Id.* at 87). Orr testified that she was "aware of the ADA," that she was aware of "what [McLane] need[ed] to do as an organization" to accommodate disabilities, but "McLane didn't give [her] any [ ] training or education about what a relay call or a TRS system was[.]" (*Id.*). Orr also stated that McLane had never hired a deaf person that she was aware of as of 2018, though she was also not aware of any

---

[4] McLane had $455 million in pre-tax earnings in 2023, with revenue of over $50 billion. (Dkt. No. 128, at 8 n.2) (citing Berkshire Hathaway Inc. Annual Report (Form 10-K), for the fiscal year ended December 31, 2023, at K-53, available at https://www.sec.gov/Archives/edgar/data/1067983/000095017024019719/brka-20231231.htm).

deaf applicants during her time at McLane. (Dkt. No. 119, at 80).[5] Tracy Gridley, another former HR employee, (Dkt. No. 121, at 4), also testified that in her 23 years at McLane, she had never met a deaf employee, (Dkt. No. 121, at 25).

In 2024, following receipt of Plaintiff's Motion for Injunctive Relief, Defendant's Associate General Counsel performed an internal and external "search for complaints of disability discrimination made by deaf or hearing impaired individuals at all of McLane's locations nationwide." (Dkt. No. 127-6, at 2-3). Defendant's Counsel's searches "yielded no results for any claims of disability discrimination made by hearing impaired or deaf individuals against McLane" since 2018. (*Id.* at 3).

Here, Defendant's argument that there is no danger of reoccurrence fails. Defendant insists that, because Orr is no longer employed by McLane, the "risk of recurrent violation" is "non-existent." (Dkt. No. 127, at 10). But Orr testified that McLane did not provide her *or* her fellow HR employees with training on the ADA. (Dkt. No 118, at 86-87). Orr and Gridley both testified that McLane had never, to their knowledge, hired a deaf employee. (Dkt. No. 119, at 80; 121, at 4). Nowhere in its briefing has Defendant expressed any intent to take steps to comply with the law in light of the jury verdict against it. *See KarenKim*, 698 F.3d at 100 ("In determining whether to impose an injunction where a defendant has ceased the offending conduct, courts may consider 'the bona fides of the [defendant's] expressed intent to comply' with the law[.]"). This reticence, Orr's testimony about the lack of HR training on the ADA, and the jury's finding that McLane *did* discriminate against Valentino on the basis of her disability, is enough to present a "cognizable danger of recurrent violation." *See United Health Programs*, 350 F. Supp. 3d at 211.

---

[5] Orr left McLane in 2021. (Dkt. No. 119, at 271).

And while Defendant claims that it has not received any additional complaints with respect to people with disabilities, the EEOC is correct in its assertion that it need not establish a widespread pattern of discrimination to meet its burden. *See, e.g., AZ Metro*, 2020 WL 7404432, at *14, 2020 U.S. Dist. LEXIS 237752, at *37 (granting permanent injunctive relief where jury found defendant willfully discriminated against two employees on the basis of age); *KarenKim*, 698 F.3d 92 at 94 (reversing and remanding where district court declined to order injunctive relief involving sexual harassment "perpetuated by a single employee"); *E.E.O.C. v. Colgate-Palmolive Co.*, 612 F. Supp. 1476, 1479 (S.D.N.Y. 1985) (granting injunctive relief where defendant discriminated against two employees on the basis of age). Finally, to the extent that McLane argues that the permanent injunctive relief is overly burdensome, most of the relief requested simply requires McLane to take steps to comply with existing federal laws. *See Hernandez*, 2024 WL 3011177, at *4, 2024 U.S. Dist. LEXIS 105944, at *12  ("[T]he jury's verdict clearly demonstrates that the defendants' conduct, as well as their existing policies and procedures, were insufficient to prevent them from discriminating against [the plaintiff] . . . [T]he injunctive relief sought by [the plaintiff] will pose no meaningful hardship to the defendants because it will merely require that they take steps to fulfill their existing legal obligations."). For all these reasons, the Court finds permanent injunctive relief appropriate in this case.

Nevertheless, any permanent injunctive relief granted by this Court must be "narrowly tailored to fit specific legal violations," without imposing "unnecessary burdens on lawful activity." *See Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994); *see also Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 202 (2d Cir. 2014) (reviewing and affirming district court's award of injunctive relief in disability discrimination

case, where the remedial order was "tailored to fit the nature and extent of the violation[.]" (quoting *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1236 (2d Cir. 1987))). As such, the Court must review the scope of the remedial order to determine what relief is appropriate.

### 3.    Scope of Injunctive Relief

#### a.    "Obey the Law" Injunction

First, Plaintiff requests that the Court enjoin Defendant from discriminating against applicants on the basis of disability. (Dkt. No. 129-1, at 2). As Defendant points out, such "obey the law" orders are generally disfavored. *See Rowe v. New York State Div. of the Budget*, No. 11-cv-1150, 2012 WL 4092856, at *7, 2012 U.S. Dist. LEXIS 132238, at *18-19 (N.D.N.Y. Sept. 17, 2012) ("'Obey the law' injunctions are vague, do not require the defendants to do anything more than that already imposed by law, subject the defendants to contempt rather than statutorily prescribed sanctions, and are not readily capable of enforcement."). Nevertheless, some courts see fit to impose such orders in cases involving employment discrimination. *See, e.g., AZ Metro*, 2020 WL 7404432, at *14, 2020 U.S. Dist. LEXIS 237752, at *37 (enjoining defendant from terminating employees because of their age for five years); *Hernandez*, 2024 WL 3011177, at *5-6, 2024 U.S. Dist. LEXIS 105944, at *18  (permanently enjoining defendant from violating Title II of the ADA); *United Health Programs*, 350 F. Supp. 3d at 219 (granting permanent injunction ordering defendants to refrain from religious discrimination and harassment). *See also E.E.O.C. v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987) (rejecting district court's finding "that an injunction against retaliation was superfluous because Title VII already prohibits that conduct," explaining that "[a]n injunction would (1) instruct [the defendant] that it must comply with federal law, (2) subject it to the contempt power of the federal courts if it commits future violations, and (3) reduce the chilling effect of its alleged retaliation on its

employees' exercise of their Title VII rights"). Moreover, the proposed injunction would only subject Defendant to contempt in cases involving discrimination against applicants for employment on the basis of disability.

However, the discrimination in this case occurred six years ago, and involved only one known applicant. As such, the court finds a two-year (rather than a five-year) injunction on these narrow terms appropriately vindicates the public interest in preventing future disability discrimination in interviewing and hiring.

### b.    Revisions to Anti-Discrimination Policies

The EEOC also "asks the Court to order revisions to McLane's anti-discrimination policies and . . . require it to provide paper copies of the revised (and EEOC-approved) anti-discrimination policies to its employees on an annual basis and to new employees within seven (7) days of hire." (Dkt. No. 125-1, at 11). Plaintiff has submitted a copy of Defendant's Equal Employment Opportunity Policy, effective as of March 1, 2019, asserting that upon information and belief it is currently in effect. (Dkt. No. 125-3, at 1, 8–10). Plaintiff notes that Defendant's current policies already apply nationwide. (*Id.*). Defendant objects to the distribution of updated antidiscrimination policies to locations outside of Baldwinsville, but does not specify any objections to the content of the EEOC's proposed revisions. (Dkt. No. 127, at 13).

With no specific objection to the content of the EEOC's proposed revisions, the Court grants Plaintiff's request insofar as that it requires Defendant to revise its antidiscrimination policy to (1) explain the purpose of reasonable accommodations under the ADA, (2) explain the terms of art used in its reasonable accommodations policy, (3) explain the process for how and to whom requests for accommodations should be made, (4) explain what managers should do upon receipt of such requests, and (5) inform employees that they may report discrimination or

30

harassment to the EEOC or comparable state and local agencies. *See United Health Programs*, 350 F. Supp. 3d at 222-24 (ordering revisions to defendant employer's antidiscrimination policies to, include examples of religious discrimination, define a hostile work environment, and include the EEOC's contact information in their policies). Defendant will also be required to submit any revised policy for EEOC approval. *See AZ Metro*, 2020 WL 72024432, at *14, 2020 U.S. Dist. LEXIS 237752, at *37 (ordering defendant employer to provide revised employee handbook section to EEOC within thirty days of entry of judgment); *United Health Programs*, 350 F. Supp. 3d at 224 (requiring defendant to revise anti-discrimination policy to include new complaint procedure, subject to the EEOC's approval); *Equal Emp. Opportunity Comm'n v. KarenKim, Inc.*, No. 08-cv-1019, 2013 WL 12424087, at *5, 2013 U.S. Dist. LEXIS 203695, at *6 (N.D.N.Y. Sept. 24, 2013) (requiring defendant employer to substitute EEOC's sexual harassment policy for its own, distribute the amended policy to each employee within fourteen days of the order, distribute the amended policy to any new employees within seven days of hire, and to immediately post the new policy in its break room).

However, the Court declines to order Defendant to remove "any language referring to the issuance of discipline for reporting 'false claims[.]'" (*See* Dkt. No. 129-1, at 3). While the Court appreciates Plaintiff's concern that such language "may have a chilling effect on employees who wish to report discrimination, harassment, or retaliation," (*See* Dkt. No. 125-1, at 13), no part of this case involved allegations of retaliation. Such a revision would go beyond the scope of the legal violations at issue. *Cf. United Health Programs*, 350 F. Supp. 3d at 224-25 (ordering defendants to remove the subsection of their employee handbook titled "False Accusations and Information" where facts of the case involved hostile work environment and wrongful termination claims). The Court also declines to require Defendant to submit future revisions of

any of these policies to the EEOC for review and approval. (*See* Dkt. No. 129-1, at 3). There are a number of legitimate reasons why Defendant may need to amend its anti-discrimination policies in future, and there is no evidence that Defendant would delete its additions after they are made—particularly because the amendments only serve to aide Defendant's compliance with existing laws. Finally, in recognition of Defendant's concerns regarding the propriety of a nationwide injunction, McLane will only be required to distribute *paper* copies of the revised section of the policy to the employees at the Baldwinsville location. *See AZ Metro*, 2020 WL 7404432, at *14, 2020 U.S. Dist. LEXIS 237752, at *37-38 (requiring paper copy of revised employee handbook section be distributed to all of defendant's employees only at the offending branch).

### c.    Mandatory Training

Plaintiffs ask that the Court require Defendant "to provide anti-discrimination training to its employees concerning disability discrimination and employee rights under the ADA." (Dkt. No. 125-1, at 14). Specifically, Plaintiff seeks no fewer than four hours of live training on the ADA for all human resource employees and supervisory employees, and at least one hour of training for non-supervisory employees, within ninety days of the order and annually thereafter. (Dkt. Nos. 125-1, at 13-1; 129-1, at 3-4). Plaintiff also seeks no fewer than two hours of live training for "for any individual responsible for responding to or investigating internal or external complaints of discrimination or retaliation from Baldwinsville applicants or employees" within ninety days of the Order, and annually thereafter. (Dkt. No 129-1, at 4-5). Plaintiff seeks training to cover the various ways hearing impaired individuals may communicate with Defendant, including via TRS, or with the use of sign language interpreters and that such training should include a mock TRS call and guidance on how to respond when such a call is received. (Dkt. No.

129-1, at 4). Plaintiff's proposed order would require Defendant to submit its proposed choice of trainer to the EEOC within thirty days of the order, and to submit its written materials within fourteen days of the first set of trainings. (*Id.* at 3-5). Defendant objects to the proposed training requirements as inappropriately overbroad. (Dkt. No. 127, at 12).

To the extent that Defendant argues no training is necessary, the Court disagrees. The proposed training requirements apply only to the employees at the Baldwinsville location, and to any individual responsible for responding to or investigating internal or external complaints of discrimination or retaliation from Baldwinsville applicants or employees. (Dkt. No. 129-1, at 7). The jury found that the staff at McLane's Baldwinsville location failed to interview or hire Valentino on the basis of her disability, and the testimony at trial indicated that HR staff received little to no training on the ADA. Training on TRS would alleviate the confusion in the TRS call in this case. The proposed training is appropriately targeted to the scope and type of discrimination in this case. *See AZ Metro*, 2020 WL 7404432, at *14, 2020 U.S. Dist. LEXIS 237752, at *38-39 (requiring two hours of live training for supervisory, management, and human resources personnel at the offending branch, and one hour of live training for all other personnel at the offending branch, within sixty days of order and annually thereafter for a period of two years). Nevertheless, the Court will reduce the required number of hours of live training from four hours to two hours for supervisory and human resources personnel. *See United Health Programs*, 350 F. Supp. 3d at 226-27 (requiring defendant employer to employ a third party to provide trainings on Title VII and the NYSHRL, to provide the EEOC copy of training materials at least fourteen days prior to such training, and to provide the trainings within sixty days of the order (and annually thereafter), but reducing the length of the requested trainings from four hours to two hours of live training). And because Plaintiff has final say on Defendant's choice of

trainer (who will presumably create the written materials for their training), the Court will not require Defendant to provide the EEOC with "proposed written materials and a training outline for approval." (*See* Dkt. No. 129-1, at 5). Nor will the Court require the EEOC to forward attendance sheets to the EEOC within fourteen days of each training session; employees will be required to attend under the terms of the injunction. (*See id.*).

### d.    Posting of Notice

Plaintiff also asks that Defendant be required "to post a notice informing its employees that the company is subject to an injunction." (Dkt. No. 125-1, at 15; *see* Dkt. No. 129-1, at 10-11 (proposed two-page "Notice to Employees of Court Judgment and Order")). Defendant again offers no specific objection, except that posting the notice at nearly 170 locations would be monetarily and administratively burdensome. (*See* Dkt. No. 127, at 14). The Court is not persuaded that posting a two-page notice in Baldwinsville's communal areas would be prohibitively expensive or time-consuming, and therefore grants Plaintiff's request with respect to the Baldwinsville location. Moreover, the posting of a notice about this lawsuit may help explain to employees why they are receiving copies of a revised anti-discrimination policies— and, in the case of Baldwinsville personnel, why they are receiving training on the ADA. However, the Court finds that the notice should not disclose the amount of the jury award, as that information would likely be more confusing than informative to employees. *See United Health Programs*, 350 F. Supp. 3d at 228 (imposing notice posting requirement but requiring removal of jury award). Therefore, the Court grants Plaintiff's request regarding posting notices, subject to the above modification and consistent with the nature of the injunctive relief the Court grants.

### e.    Statement to Applicants

Plaintiff additionally requests that McLane be required to "include on each job posting a statement to applicants . . . expressing McLane's commitment to equal opportunity in all aspects of employment and encouraging all qualified applicants to apply, including those with disabilities." (Dkt. No. 125-1, at 16). However, McLane's job postings already contain a statement that provides "[a]ll qualified applicants will receive consideration for employment, without regard to . . . disability[.]" (*Id.* at n.4 (citing Dkt. No. 125-3, at 13)). Moreover, McLane's website (according to Plaintiff) already contains a statement indicating that Defendant "will provide reasonable accommodations to applicants with disabilities." (*Id.* at 16 n.5). Plaintiff cites no legal precedent in support of such relief. Given that Defendant's website already includes language regarding equal opportunity and access to people with disabilities, the Court declines to grant Plaintiff's request that Defendant revise its job postings.

### f.    Recruitment of Deaf and Hard of Hearing Applicants

Plaintiffs further ask that Defendant "be required to take steps to recruit deaf and hearing-impaired individuals for employment," including "submitting its [Baldwinsville] job postings to and conducting at least two (2) outreach events per year with organizations serving this community[.]" (Dkt. Nos. 125-1, at 17, 129-1, at 6). Again, Plaintiffs cite no legal support for such a significant imposition. The Court finds this request overly broad, and not narrowly tailored to address the discriminatory conduct involved in this case. Therefore, the Court denies Plaintiff's request that Defendant be required to recruit deaf and hearing-impaired individuals.

### g.    Recordkeeping and Reporting

Finally, Plaintiffs seek an order requiring Defendant to provide the EEOC with "semi-annual reports . . . reflecting any complaints of disability discrimination received by McLane

from applicants and employees[.]" (Dkt. No. 125-1, at 17). Plaintiff argues "this will enable the EEOC to take prompt action should additional incidents of discrimination to occur." (*Id.*). Again, Defendant's sole objection is that the request is overbroad. (Dkt. No. 127, at 12). Other courts have seen fit to impose reporting or recordkeeping requirements in cases involving employment discrimination. *See AZ Metro*, 2020 WL 7404432 at *14, 2020 U.S. Dist. LEXIS 237752, at *39-40 (requiring that, within ninety days of entry of judgment and annually thereafter for a period of two years, defendant employer report to EEOC any complaints of age discrimination or retaliation at the offending branch); *United Health Programs*, 350 F. Supp. 3d at 228 (requiring defendant employer to retain and preserve all documents related to defendant's compliance with the court's injunctive order, and to provide EEOC with attendance records for trainings and acknowledgement forms confirming employee receipt of defendants' notice letter and anti-discrimination policy). The court finds that Plaintiff's proposed reporting requirements, when imposed for a two-year rather than a five-year term, are "narrowly tailored and not onerous." *See id.*

However, Plaintiff also asks that Defendant "begin to log in its Applicant Tracking System (ATS) all phone calls from applicants to its Baldwinsville facility." (Dkt. No. 125-1 at 17-18). Defendant does not respond to this request, but neither does Plaintiff provide any legal precedent in support of its proposed imposition. And, given that Orr testified at trial that she was looking at "thousands of applications" while using the ATS (Dkt. No. 119, at 7), the addition of an additional recordkeeping requirement in Defendant's application process would likely be overly broad and burdensome. Therefore, the Court denies Plaintiff's request that Defendant log applicant phone calls.

### D.    Additional Equitable Relief

#### 1.    Relief from Adverse Tax Consequences

In addition to the above, Plaintiff asks the Court to award Valentino "an additional amount to account for the negative tax consequences that will result from the jury's damages awards." (Dkt. No. 125-1, at 18). Specifically, Plaintiff seeks a "tax gross-up" that accounts for Valentino's increased tax liability attributable to receiving her backpay award as part of a lump sum. (*See id.*). According to Plaintiff, Valentino will be subject to a much higher tax rate in 2024 because of the combined total of her backpay, compensatory, and punitive damages awards. (Dkt. No. 125-1, at 19). As a result of those awards, Valentino faces an increased tax burden based on her receipt of backpay in 2024, as part of a lump sum, rather than as wages in 2018. (*See* Dkt. No. 125-3, at 2-6).

Using publicly available tax tables available online via the Internal Revenue Service ("IRS") and New York State Department of Taxation and Finance websites, (Dkt. No. 125-3, at 1-6, 15-18), along with information about Valentino's income and tax filings, (Dkt. No. 125-4), Plaintiff calculated Valentino's estimated taxes in 2024 both with and without her backpay award. Plaintiff found that Valentino's "total tax liability for 2024 including the backpay award would be $100,729.35, and without backpay, $90,266.85." (Dkt. No. 125-3, at 5). This means $10,462.50 of her 2024 tax liability is attributable to the backpay award. (*Id.*). Plaintiff also concluded that if Valentino had "received the backpay wages in 2018, she would have paid $2,157 in taxes on those wages." (*Id.*). Therefore, says Plaintiff, Valentino's "total *increased* tax burden resulting from the payment of backpay in 2024 is the difference between the tax burden for the backpay award for the 2024 tax year ($10,462.50) and the tax burden applicable if earned in 2018 ($2,157)." (*Id.* at 6). That difference, according to Plaintiff, is $8,305.50. (*Id.*).

Defendant objects, noting that the key difference between Valentino's tax liability in 2024 as opposed to 2018 is her compensatory and punitive damages award. (Dkt. No. 127, at 16). Defendant argues that Valentino "was on notice that by virtue of this litigation, she could receive a monetary award that would result in additional tax liability." (*Id.*). Further, says Defendant, Plaintiff's request should be denied "because it based on the EEOC's speculative completion of tax worksheets without the consult or advice of a tax professional." (*Id.*, at 17).[6]

As Defendant concedes, "[t]he Second Circuit has not addressed whether a plaintiff may be compensated for the additional tax burden incurred through lump sum payments of back pay." *Tse v. N.Y. Univ.*, No. 10-cv-7207, 2016 WL 10907062, at *35, 2016 U.S. Dist. LEXIS 205003, at *86-87 (S.D.N.Y. Aug. 29, 2016). "In the absence of such guidance, some [c]ourts in this Circuit have awarded additional damages for increased tax liability, while others have declined to do so." *Id.*; *compare Saber v. New York State Dep't of Fin. Servs.*, No. 15-cv-5944, 2018 WL 3611718, at *2, 2018 U.S. Dist. LEXIS 126161, at *6 (S.D.N.Y. July 27, 2018), *aff'd*, 771 F. App'x 48 (2d Cir. 2019) (awarding the plaintiff $4,152 "for increased taxes he will have to pay as a result of receiving back pay in a lump sum rather than annually") *and Castelluccio v. Int'l Bus. Machines Corp.*, No. 09-cv-1145, 2014 WL 3696371, at *1, 2014 U.S. Dist. LEXIS 100057, at *2 (D. Conn. July 23, 2014) (granting the plaintiff's motion for compensation for increased tax liability and awarding $209,488) *with Morgenstern v. Cty. of Nassau*, No. 04-cv-58, 2009 WL 5103158, at *6, 2009 U.S. Dist. LEXIS 116602, at *18 (E.D.N.Y. Dec. 15, 2009) ("Although there is precedent for such an award, the court declines to award the plaintiff an additional monetary amount to offset the increased tax consequences of the economic damages

---

[6] In response to this argument, Plaintiff has offered to "submit an expert report calculating the relevant tax" "if the Court deems it necessary (or at all useful)[.]" (Dkt. No. 129, at 14 n.16). Plaintiff also (correctly) observes that Defendant "does not claim any of [its] calculations were incorrect." (*Id.* at 14).

award she will receive."). *See also Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, No. 96-cv-8414, 2016 WL 11485633, at *15, 2016 U.S. Dist. LEXIS 103132, at *56 (S.D.N.Y. June 13, 2016) ("The circuits have split over whether a tax gross-up is permissible under Title VII. While the Second Circuit has not yet weighed in on this question, Plaintiffs claim support from the Third, Seventh, and Tenth Circuits, which have held that Title VII permits tax gross-ups when necessary to make a claimant whole. Defendant points to the D.C. Circuit, which has held that such awards are not permissible. I recommend that the Court follow the majority approach as that approach more closely hews to the Title VII goals that the Supreme Court has identified."), *report and recommendation adopted*, 2016 WL 4129111, at *3, 2016 U.S. Dist. LEXIS 102216, at *10 (S.D.N.Y. Aug. 3, 2016) ("The Court agrees with the Special Master, the Third Circuit, Seventh Circuit, and Tenth Circuit that a tax gross-up is appropriate when necessary to make a claimant whole.").

Defendant is correct that, but for Valentino's award of $300,000 in compensatory and punitive damages, Valentino's tax liability would not have increased so significantly. But that award is also a result of Defendant's actions; but for Defendant's discriminatory conduct, Valentino would not be receiving her backpay as part of a lump sum and would not be faced with an increased tax burden. The jury awarded Valentino $25,000 in lost wages and benefits. (Dkt. No. 115, at 3). If she had received that money in 2018, she would have paid $2,157 in federal and state and local taxes. Because she is receiving that money as part of a larger lump sum, that $25,000 back pay award instead increases her overall tax liability by $10,462.50. This means that $8,305.50 of her total tax liability is due to the delayed receipt of her backpay as part of a lump sum, rather than as part of the wages and benefits the jury determined she should have received in 2018.

Defendant argues that Valentino "is responsible for her own taxes as if she had been a McLane employee," (Dkt. No. 127, at 15), and Plaintiff agrees: Valentino should "be treated as if she had earned those wages back in 2018, over the course of her employment," (Dkt. No. 129, at 13). The jury awarded punitive damages and damages for emotional distress; the jury did not award damages to compensate Valentino for the increased tax burden attributable to her backpay award. The Court is satisfied that an additional $8,305.50 is necessary to make claimant whole. *Cf. Castelluccio*, 2014 WL 3696371, at *1, 2014 U.S. Dist. LEXIS 100057, at *2 (awarding $209,488 in compensation for increased tax liability where jury awarded $999,891.64 for back pay and benefits, $999,891.64 for liquidated damages, and $500,0000 for emotional distress damages); *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 442-43 (3d Cir. 2009) (awarding plaintiff $6,893 as compensation for the negative tax consequences of receiving her lump sum back pay award, where jury already awarded her back pay and compensatory damages totaling $200,000).

### 2. Post-Judgment Interest

Finally, Plaintiff seeks post-judgment interest from the date of entry of the judgment until the date of payment. (Dkt. No. 125-1, at 21). Plaintiff accepts that the judgment will be modified in conformity with the statutory cap. (*Id.* at 22). Defendant does not contest the award of post-judgment interest, so long as it is calculated based upon the amount of the reduced judgment. (Dkt. No. 127, at 17 n.7). Accordingly, Plaintiff is awarded post judgment interest to be calculated pursuant to 28 U.S.C. § 1961. *See Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004) (noting post-judgment interest is mandatory in a civil case under 28 U.S.C. § 1961).

### IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's renewed motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, (Dkt. No. 126), is **DENIED**; and it is further;

**ORDERED** that Defendant's motion for a new trial or to vacate or remit the jury's damages awards pursuant to Rule 59 of the Federal Rules of Civil Procedure, (Dkt. No. 126), is **GRANTED** only to the extent that the statutory cap requires the total compensatory and punitive damages awarded be reduced to $300,000; and it is further

**ORDERED** that Defendant's motion for a new trial or to vacate or remit the jury's damages awards pursuant to Rule 59 of the Federal Rules of Civil Procedure, (Dkt. No. 126), is otherwise **DENIED** in its entirety; and it is further

**ORDERED** that Plaintiff shall, within thirty days of the date of this decision, provide the Court with written notice of whether Plaintiff has accepted the remittitur according to the statutory cap; and it is further

**ORDERED** that Plaintiff's motion for a permanent injunction (Dkt. No. 125) is **GRANTED in part and DENIED in part**, in accordance with the above; and it is further

**ORDERED** that the Plaintiff shall draft a new Order Granting Injunctive Relief in accordance with the above, for a period of two years, then meet and confer with Defendant in an effort to resolve any remaining differences, and submit the revised proposed Order to the Court by January 31, 2025 with a status report describing any remaining objections by Defendant; and it is further

**ORDERED** that Defendant's motion for additional equitable relief (Dkt. No. 125) is **GRANTED**; and it is further

**ORDERED** that Plaintiff is awarded $8,305.50 as compensation for the negative tax consequences of receiving her lump sum back pay award; and it is further

**ORDERED** that Plaintiff is awarded post judgment interest to be calculated pursuant to 28 U.S.C. § 1961.

**IT IS SO ORDERED.**

Dated: <u>December 18, 2024</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge